take up our next case which is Fogel v. Vega. All set? Thank you. May it please the court, Thomas McKenna for Mr. Fogel and the putative class. I'd like to start with two points. One, I think that if we go back to the original complaint everything we've been complaining about from the outset is mentioned in one way or another in the original complaint. And we clearly pled that this bribery and corruption and falsification of accounting records and cover-up situation is a scheme. And it's a scheme that satisfies Rule 10b, A and C. As to the two new parties, though? As to the two new parties, they were on notice. If we look at Krupsky, Krupsky teaches us that we have to look at what the defendants knew. Mr. Rank was the CEO of Walmex the day we sued Walmex. Mr. Rank is making public statements all the time including in the annual reports and in press releases which we added. Mr. Rank, we found out later, and this goes to what the defendants know, we found out later that Mr. Rank personally vetted the December 8, 2011 Walmart false statement. They bring the false statement to the CEO of Walmex and say, hey, take a look at this. We know the New York Times is after us. They've been on our trail since October of 2011. We need to say something. We need to spin this in some way. Take a look at it, Mr. Rank. And he vets it along with a long list of Walmex board members, Walmex officers, and a long list of Walmart officers. So Mr. Rank knew he was up to his eyeballs in this situation and knew we would have sued him if we knew what he knew. And he also is the executive driving the growth which is through the bribery. As far as Walmart, in the original complaint, we named 10 individuals by name that were involved in the corruption and in the cover-up. Five of those people worked for Walmart. So Walmart also knew or should have known that it would be sued. And it was being sued in Arkansas for the same false statements and cover-up that we're trying to bring on behalf of the purchasers of the Walmex ADRs. So I submit we satisfy Krupsky as to those two people. And everything in the second amended complaint I also submit relates back to the original complaint. The original complaint alleges bribery, the falsification of accounting records, the lack of internal control . . . Let me ask you about Vega, though. The district court said that you can't just because of his title, you can't rely on that as sufficient allegations. But you didn't say . . . I didn't see that there were specific statements or reports or e-mails that Juarez sent to Vega that would have put him on notice of the specific conduct. Is there any pleading to that effect? No, Your Honor. Why not? Mr. Vega, to me, is the zealot of this whole situation. Zealot? Zealot, like the Woody Allen fellow that turns up everywhere. He's on the board, the chairman of the board of Walmex and the chairman of the audit committee from 2004, if not earlier, all the way up to 2012. They have a long laundry list of people they've admitted vetted the false statements, knew about the bribery, knew about the cover-up. He's not on it. So I say it's a closer call. I concede it's a closer call as to Mr. Vega. But you'd have to believe that the chairman of the board and the chairman of the audit committee in a case involving the falsification of audit records, when the Walmart unit, the investigative unit comes down to Mexico to investigate, going through their books and records, finding the evidence of the accounting falsifications, the just story, illegal payments, paying the Mexican lawyers to bribe, that the only person in the whole building who didn't know this was going on is Mr. Vega. I think what you're... Is this a fair statement of what you're suggesting? That you're not just relying on his job title, as might be the case if there's some kind of skullduggery going on with cooking the books and he should have known or should have been advised or something like that based on his title. It's not that kind of inference. You're saying that since this is really about the cover-up, that this is a situation where once the Walmart people are sort of crawling all over the office and people in the company are complaining about the intrusion from Arkansas and all of this, that under those circumstances, if he's in the building, he has to know that this is going on. Is that kind of the idea? Yes, Your Honor. It's the context of the entire controversy. It doesn't get much bigger than to have the investigators from Walmart, to have the general counsel of Walmart International fly down from Bentonville to try to get to the bottom of this, to hire Wilkie Farr and Gallagher, which they squash. So of course the whole building was in uproar about it. And Solorzano picks up the phone and starts complaining to Duke and the others, stop it. And they give it to Rodrigo Magado to clean it up. So yes, I submit that the fair inference is that Vega knew. But do we have a smoking gun? No. Could you go back to the very first thing you said? And I appreciate that by beginning with a reference to subsections A and C, you're not abandoning the argument that there are false statements here. But you started with the idea of this is a scheme. And truly what is alleged is a scheme. Is it a scheme to defraud the shareholders? Well, it's a scheme to break the law, to benefit the 70% shareholder of Walmart, to grow the business of Wal-Macs. And it's a scheme that... If it benefits the 70% shareholder, doesn't it also benefit the other 30% shareholders too? It does, except for the people who bought the stock in the class period based on the minimum drops out when the cover-up is exposed. And that's what my clients in the class, they're the ones left holding the bag. That sounds like, again, you said because they bought in reliance on the false statements. And that I understand. That brings it back to the false statements though. That's not... It's not just the fact that... It sounds like when you talk about a scheme, you're talking about a scheme that may violate the Foreign Corrupt Practices Act or it may violate Mexican law or it may be morally corrupt or whatever else it is. The scheme to do the bribery and then hide it from everyone. Is that inherently a scheme to defraud the shareholders? It is, Your Honor, because it's benefiting the corporation because it's using its subsidiary to break the law to grow its profits. And the high-level officers and directors are either doing it or covering it up. And the cover-up continues. They know the New York Times is on their case in October of 2011 and they had a chance to reveal it then. They chose not to. They chose to continue to conceal it until April. But I mean, it sounds like... And one hates to say something that sounds like it's almost a crime. If they had had a successful cover-up, everybody would have benefited among the shareholders, not just the 70% shareholder. And when it collapsed, everybody lost, including Walmart. The value of their shares goes down too. Yes, but the difference is they're guilty and my clients are innocent. I think our concern is what you're saying is basically any corruption within a corporation is a securities case because when it's exposed, presumably there will be a diminution in the stock price. Is that what your argument reduces to? That any corruption within a corporation is a securities action? I wouldn't presume to jump that far to make the law. What I would say here, when you have a multi-year conspiracy to falsify accounting records, cover up a conspiracy, and when you say you're not doing that, that you're in compliance with the Mexican market securities law, you're in compliance with the Audit Practices Committee and such, when that's not true and you know that's not true, this is a case that has a combination of the scheme and false statements. There's a good case, SEC, I think we cited in our brief, Judge Cram decided it, it's a combination of a scheme and false statements. You can have both because that's how people do it. That's how they pull it off. So with respect, I don't see- With respect to the false statements then, just trying to break that down so that we can understand what we're talking about, do you agree with the analysis in the Epeliz brief that we are down basically to eight alleged falsehoods because all the other false statements that are alleged in either complaint are barred by the statute of limitations or statute of repose, and you haven't appealed that ruling? Yes, Your Honor. We say those years of drumbeat of saying we obey the Mexican securities law, we obey, our accounting is proper, we're not corrupt, we say that's evidence of the scheme. We're not trying to sue upon them. We're suing upon the false 2011 annual report statements. And five of those eight statements are basically statements about what the books and records show, which are effectively accurate. There's no suggestion that they didn't make this money in that year or they cooked the books in a way that is relevant to how many dollars they made or didn't make. You're effectively saying any financial statement is a falsehood if the money was made in a way that was illegal and if it's exposed, then it will turn out to, what, they still made that money? Yes, Your Honor. The five of these are just flat out earnings statements. That's correct, and I'd put them in Pot B. I'm not hanging my hat on Pot B, I'm hanging my hat on Pot A. But just quickly on Pot B, if you're constantly telling people you're growing your business but secretly it's because you're bribing, the question is are you putting an issue, how did you grow your business so well? If you are, then you have a duty to somehow, if you're not, then they're in Pot B. But your first hook for your hat are the three statements that say we're complying with the law when they weren't. Correct, and that their controls are in place and that they have . . . We're ethical, aren't we? Exactly, and in any . . . Mr. McKenna, you have a few minutes left for rebuttal. Why don't we hear from Mr. Wald first? Thank you, Your Honors. Peter Wald on behalf of the defendants. Let me start with where the panel ended, and that is a cataloging of the statements that are at issue. There are five press releases that factually narrate year-over-year comparative store sales and opening of new units. They say nothing more than that. Mr. McKenna does not claim that they say anything more than that. This Court's jurisprudence is clear, we submit, that where you do something like a factual narrative of inarguably accurate financial information, and you don't go on to say that you have achieved that financial result as the result of something that Mr. McKenna is complaining of, that's not actionable. The Vion case says that, Marsha McLennan says that. You've heard him correctly. He's now acknowledged that his claim basically depends on three statements of asserted compliance with the law and ethical conduct. All right. Let me turn to those then, Your Honor. First of all, and this is important, nowhere in the SAC, in this Second Amendment complaint, does Mr. McKenna allege that there are two statements. One is a press release, Walmex is committed to act with integrity and in full compliance with the law, and the other is from the 2011 Walmex Annual Report, honesty and integrity continue being non-negotiable core values. Nowhere in the Second Amendment complaint does the appellant argue that those statements are false. There's no allegation. He does not take that on. The only thing that he says when we raise this is that, well, you have to understand they were false in the complaint, nothing from the original complaint, nothing from the Second Amendment complaint. And as the Court is well aware, the Third Amendment complaint is not in front of the Court. And so what we would submit, Your Honor, is that he's waived this argument. He stands up before you now and makes this argument. It's not before this Court on appeal. In addition, Your Honors, these statements are classic puffery, as the Court has held in cases like Indiana Public Retirement System, the ECA case, and others that are cited. These are statements which reasonable investors don't attach significance to because they are not specific. And this Court's jurisprudence in all of the cases that we cite in our brief finds this time and time again. Mr. McKenna argues in his brief that the question of ethical compliance and integrity is an important issue. And as we point out, and as this Court has pointed out, that conflates the concept of importance with the concept of materiality. General statements with respect to being committed to integrity are not statements that are actionable. You know, I know we've said that many times, and I don't have any quarrel with it, as a repeatedly over the years, we have a code of conduct where we always behave ethically. And then it turns out that no one can really guarantee that, and they did something improper. So I appreciate that that is normally puffery. I thought the context that Mr. McKenna was referring to in his brief was actually the context of, but they also know that the New York Times has a story that does considerable damage to the idea that they always behave with integrity. And they're trying specifically to counter the public relations hit that that may be by, in effect, denying the story before it even comes out. Does that make a difference as compared with just a generalized statement that we always obey the law? Well, first of all, Your Honor, I believe that his allegations with respect to Mr. Rank, again, are taken from the third amended complaint with respect to the interrogatory responses. And to be clear, those interrogatory responses said nothing more than that Mr. Rank and others were shown drafts of a press release which talked about allegations of violations having been made six years previously. And those had surfaced, and the company was then proceeding to investigate them. That is the most that is alleged anywhere in the New York Times article or in Mr. McKenna's argument. So that's the background. When you ask the question, does the pendency of the New York Times article, even assuming that it's part of the SAC, not the TAC, for these purposes, does that change the question of integrity? And I would submit, Your Honor, that the answer is no, because it's really important, I think, from the point of view of the consistency of this Court's jurisprudence, that what you need to do if you want to transform a generalized statement about commitment to a company, and you were on the panel, in the Indiana public retirement system, where it says, a company's specific statements that emphasize its reputation for integrity or ethical conduct as central to its financial condition, or that are clearly designed to distinguish the company from other specified companies in the same industry. There's no indication of that here. Mr. McKenna doesn't argue it. It wasn't raised in the district court. It's not raised in the briefs. So it's one thing to stand at the podium and spin a tale. It's another thing to be able to point to allegations, you know, that are well formed in the complaint, in the operative complaint, and to be able to demonstrate that those allegations meet this Court's jurisprudence. And Judge Fala, I think, looked at that jurisprudence and said, there's a naked, what, 12-word statement, quote, honesty and integrity continue being non-negotiable core values. That is literally what Mr. McKenna challenges. With respect to the question of compliance with the Mexican securities market law, I would note a couple of things here, Your Honor. First of all, Mr. McKenna doesn't argue that that statement of compliance is not puffery. He never takes that on. He doesn't, in his brief or in his argument, disagree that that's puffery. He does, as Judge Fala found, he also doesn't claim, certainly doesn't allege in the second amended complaint, that it was false. The second amended complaint nowhere says what provisions of the Mexican securities market law were violated and in what way they were violated. And so on appeal, he does not contravene the finding that it is puffery. And this Court, again, has consistently, time and again, held that statements of compliance with the law, this is the UBS case, and there are others that are cited in our brief, mere statements of compliance with the law are not material to investors and therefore are puffery. And he does not contravene that. So even if one were to go down the road of falsity, and we certainly agree with Judge Fala that the appellant did not raise this issue below, it's of no moment because he has conceded that this is a puffery statement. Your Honors, I'm happy to respond to any other questions, but I really do think we're down to those two statements as the only two statements that are at issue. I guess I would take on that timeliness point just briefly with respect to the new parties. With respect to Wal-Mart. This is just a purely technical question, but I thought there were three actually, the December Womex press release, the Womex 2011 annual report, and the Womex website. But they're basically all one statement. They're the statement, I mean it's either puffery or it's not. They're all, it doesn't matter. You are correct, Judge Lynch. I would note though with respect to the website statement, with respect to the only part of the website statement that's actually quoted in the original complaint, which is the code of best practices, they've abandoned that on appeal. You will not find that in their brief. So the only thing really, I think, are the statements that you noted. And for all the reasons we've said, they're puffery, he doesn't contest that, and they're not false. With respect to the relation back issue, if I may, just very briefly with respect to the parties. With respect to Wal-Mart. If there's no scheme and no misrepresentations, none of that matters. Correct. Only if we find that there has been a claim stated against somebody that we have to worry about whether people think it's true. That's absolutely correct, Your Honor. I want to point out just a few things. With respect to Wal-Mart, the plaintiffs do not appeal Judge Vaila's finding that the Form 10-Q, the 2011 Form 10-Q is not actionable and is untimely. They don't appeal that. And so Wal-Mart is out of the case because that's the only claim against Wal-Mart. It's the only statement against Wal-Mart. With respect to Mr. Rank, Mr. McKenna said on his address, look at all the things that we put into the complaint, he must have known. I would flip the analysis, Your Honors. I would say, look at the things that they put in the complaint that show that they knew who Mr. Rank was and what his position was at Wal-Mart, and yet they didn't sue him. What is to be taken from that if you're Mr. Rank? The obvious, which is he has no exposure because he didn't do anything wrong. And the only thing they come back with is something that is in the TAC, not in the SAC, and as I said, it's simply a review of the interrogatory responses later on, which talk about allegations. Nothing more. No adjudicated wrongdoing. These are allegations. One final point on scheme liability. There's really two elements to it. One is the cover-up, and one is the alleged cover-up, and one is the alleged bribery. The cover-up issues, as the Court in Minaldi v. Ock Ziff found, is just a redox of the misrepresentation claims. And as Judge Fala said, it's nothing more than the misrepresentation claims. It's not independently actionable under A and C as a scheme. That leaves the cover-up. And as Judge Fala found, the cover-up is not alleged to have extended beyond 2005. There isn't a single, I strike that, Your Honors, I have it mixed up. The cover-up is the redox of the misrepresentation. The bribery scheme is not alleged to have extended beyond 2005. There's no paragraph which says that it extended beyond 2005. And in paragraph 26 of the original complaint, Mr. McKenna's complaint, he quotes the following from the New York Times article. This is page 10. Quote, one very interesting postscript Mr. Halter wrote in an email to his boss, Mr. Lewis. All payments to these individuals and all large sums of money paid out of this account stopped abruptly in 2005. So not only is there no allegation in the original complaint on a statement that there was no evidence that the bribery, if there was bribery at all, that it continued after 2005. Thank you, Your Honors. Mr. McKenna, you have a few minutes for rebuttal. Yes, thank you. Okay. My adversary began by saying that we didn't point out what was false about the February 20, 2012 audit letter from Vega, which is also incorporated by reference into the 2011 annual report, which doesn't come out until April of 2012. So Vega first does a press release saying what the audit committee has found, and then they put it in the 2001 annual report, which comes out two months later. That is explicitly in our second amended complaint, and we mention the audit letter by Vega in the original complaint. It's from the beginning of the case. And paragraph 235 to 237 of the second amended complaint, page 8, 258, excuse me, 260 of the record, we cite the entirety of his letter, and we say in the next two paragraphs that it's false. So that's not accurate. Secondly, we also cite to the annual report, excuse me, the audit letter itself in the second amended complaint, paragraphs 196 to 198, again, saying that it was false. So those, that same letter The nature of the falsity on that statement so that I don't conflate it with anything else. It's the same document showing up two places, and we're saying that it's false because they're not in compliance with the Mexican securities market law. They don't have proper internal controls, and they, because of what we're talking about, the altering of the books and records. So that is in the second amended complaint, and it's also mentioned in the original complaint at paragraph 22. So that's been in the case from the beginning. Puffery, we don't concede that these statements are puffery. We say that when you look at this in context, which you're supposed to do under the case law, there's no corruption known in Mexico. This is Walmex, the little brother of Walmart. They copy word for word the Walmart website onto theirs. They copy word for word, excuse me, the code of ethics and all of their things about how they obey the law from Walmart. So investors who know about corruption in Mexico will be assured it doesn't involve the Walmart family. It might be other Mexican companies, but it's not us, and it's a drumbeat that goes on for nine years. We cite three cases in our briefs from Brazil, very similar fact patterns, where they're bribing the government officials, they're covering it up, they're cooking the books and records. It's called the Eletrobras case, the Petrobras case, and the Banco Bacido case. Three district court cases here in the Southern District of New York all found that in context, statements that you obey the law, that you're ethical, your books and records are accurate, when you know they're not, when you're bribing government officials, actionable. So we submit those cases are good for us. All right. Now, those claims that you've just alluded to are among those that the district court found untimely, correct? I think the judge got confused and didn't realize that the 2011 annual report included the vega audit letter of February 20, 2012. So I'm not exactly sure what the judge was thinking, but . . . The point is she ruled on it as untimely, and I thought you told us in your main argument that you weren't challenging the rulings that she made on timeliness grounds. So I'm trying to sort out how we would look at this if you're not challenging her timeliness rulings. I'm not challenging her timeliness rulings for statements made before the start of the class period, which starts on December 8, 2011. These statements were . . . I'm not sure what you're claiming. Her findings were that many of your arguments, including this one or many of your claims, did not relate back. So assuredly they came after the start of the class period, but she found they didn't relate back. And I thought you told us on your main argument that you weren't disputing that. I responded to Judge Lynch's question that I was not challenging as actionable statements made before the start of the class period. That's all I said. There are eight statements that were held to be outside the class period or outside the statute of limitations. You're not challenging those. What you are now talking about is a report, which comes out in whatever date in 2012 . . . April. . . . that was not dismissed for being untimely. That's correct. Though there is some question that these are mostly present tense statements about 2012. They're not statements that say we had great internal controls in 2005 or we've always been ethical or back in 2005 we didn't do anything like this either. Correct. But our argument, Judge, is that the cover-up continued. They know the New York Times is on their scent in October of 2011 and the two companies go into spin control and keep the cover-up going. They have a chance to come clean right then in October, but they don't. They wait until an article comes out in April and the stock drops and then they say, oh, mea culpa, we did it. Okay. Thank you, Mr. McKenna. Thank you, Judges. We have a reserved decision on this case. The next two cases are on submission, so we'll ask the clerk to adjourn court at this time. Court is adjourned.